UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-23424-HOEVELER

KRISTEN CANTLEY and
BECKETT CANTLEY,

    Plaintiffs,

v.

STEPHEN DUCHARME et al.

    Defendants.
_____/

## ORDER GRANTING MOTION TO DISMISS

BEFORE the Court is the defendants' motion to dismiss for improper venue based on a forum-selection clause in the condominium purchase and sale contracts. The motion has been fully briefed and is ready for a decision. For the reasons that follow, the motion to dismiss is GRANTED.

### I. Background

#### A.

The plaintiffs are husband and wife Beckett and Kristen Cantley, who claim they were victims of the defendants' scheme to defraud them out of their down-payments on condominiums in Panama. In 2005 the Cantleys became interested in investing in real estate. They had discussions with the defendants, brothers Stephen and Michael Ducharme, who sell Panamanian condominiums through their

real estate company, American Health, Inc. ("AHI"). After visiting Panama to view properties, Kristen Cantley entered into an agreement with AHI in February 2006 to purchase Unit 28-B in an unfinished condo building called the Venetian. The purchase price was $665,000 (though the plaintiffs claim the Ducharmes said the unit was worth at least $800,000), which Mrs. Cantley agreed to pay in three installments of $66,500, and then a final payment of $465,500 once the building was ready for occupancy. In their complaint and in Court submissions, the plaintiffs draw attention to three clauses contained in the Venetian Agreement. The first is the "Ten Percent Clause" in paragraph 6, which permits Mrs. Cantley to cancel the purchase up until 60 days before the final payment of $465,500 became due. If she cancelled, AHI was "then free to resell the apartment and [AHI] shall retain 10% of the purchase price of the apartment." Venetian Agreement ¶ 6, ECF No. 3-1. The plaintiffs claim Mrs. Cantley cancelled the Venetian deal pursuant to the Ten Percent clause, but AHI nevertheless retained approximately thirty percent of the purchase price. The next clause is the "Best Efforts" provision in paragraph 13, which stipulated that if Mrs. Cantley wished to sell the apartment prior to closing,[1] AHI will "make its best effort to assist [in the re-sale] without charge, [which] may include but is not limited to listing the apartment on

---

[1] The Cantleys evidently intended to "flip" the unit by reselling it for a profit before they final payment became due.

its Web site." Id. ¶ 13. The Cantleys claim that the Ducharmes not only refused to help resell the unit, but they also lied about locating various potential buyers in order to induce the Cantleys to continue making the deposit payments. Finally, the Venetian Agreement contained a forum-selection clause stating: "[t]he present agreement is subject to the laws of Panama and disputes will be settled in Panama, unless both parties agree to settle the dispute in another court." Id. ¶ 11.

In August 2006, the Cantleys visited Panama to observe the Venetian's construction progress, at which time the Ducharmes offered to sell them two additional condo's in a different luxury building called the Vitri. The plaintiffs allege the Ducharmes orally promised that the Vitri contracts would include the same "Ten Percent" and "Best Efforts" clauses that were included in the Venetian Agreement. On September 22, 2006, Beckett Cantley authorized his company, Worldwide Acquisitions, LLC ("WWA"), to enter purchase and sale agreements for Vitri Units 31B and 37B. These contracts, however, omitted the Ten Percent and Best Efforts clauses. The plaintiffs argue that the Ducharmes' specific promises about including favorable contract terms, as well as the Ducharmes' generalized assurances about increasing property values, caused the plaintiffs to invest in the properties under false pretenses.[2]

---

[2] The "Ten Percent" and "Best Efforts" clauses were obviously absent from the written Vitri contracts, which both sides initialed on each page before signing. The plaintiffs have not explained how

3

In 2006 and 2007, Mrs. Cantley paid the three installments of $65,500 on Venetian unit 28-B, as required, for a total of $196,500. At some point the Cantleys asked AHI to help them either sell the unit, or obtain a loan so they could afford the final payment. Throughout 2007, the Ducharmes reported (falsely, according to the plaintiffs) that AHI was attempting to sell the Venetian condo, but prospective buyers kept backing out.[3] By March 2008, Stephen Ducharme advised the Cantleys that the due date for the final payment of $465,000 on the Venetian unit was fast approaching, and the Cantleys needed make the payment to avoid breaching the contract. That spring Beckett Cantley emailed Stephen

---

they relied on the Ducharmes' oral representations. The Court also notes that, in explaining the sequence of events from 2006 to 2009, plaintiffs seem to reject the possibility that the devaluation of the Venetian and Vitri condominiums had any relation to the 2007 housing bubble and financial crisis. Without making reference to these economic conditions, the plaintiffs argue that their inability to flip the units was caused by the Ducharmes "fraudulent" optimism and lies about property values, financing, and re-sale possibilities. The written contracts themselves make no promises about property values or financing, and only state that AHI will make best efforts to assist in flipping the units, which it may have done. But these issues must be decided at trial in Panama based on a complete record.

[3] It appears to be undisputed, however, that sometime in 2008 Stephen Ducharme reported a $750,000 offer for the Venetian unit, which Beckett Cantley rejected. The offer would have yielded about $50,000 profit to the Cantleys, which would have represented a 25 percent return on the money they had paid in deposits so far. Although the Cantleys claim, in retrospect, that the $750,000 offer was false--one of many fake "leads" the Ducharmes reported to create the illusion AHI was trying to sell the condos--the record suggests that Beckett Cantley believed the offer was legitimate at the time he rejected it.

Ducharme to say that he had received several purchase inquiries for the Venetian unit, and also had "financing in the works." See Def.'s Mot. to Dismiss, EX. A-1 ECF No. 38-1. Mr. Cantley requested that AHI either "(1) buy me out by paying me back my initial investment, or (2) wait for one of these things to come to pass." He warned that if AHI foreclosed on the Venetian and kept the deposit, he would "follow through with a long bleeding lawsuit that removes any profit from your seizure over time." Id. The record shows that Stephen Ducharme responded July 8, 2008, indicating that AHI had "no contractual obligation to buy Ms. Cantley out of [the Venetian] contract." Id. Instead, she had a "contractual obligation to make the final payment and has missed that opportunity such that she no longer has any contractual rights to this property." He added, however, that, despite Mrs. Cantley's default on the Venetian unit, AHI would continue to allow her the opportunity to "rectify her default." He also indicated that, although AHI was entitled to keep the Venetian deposits, "in an effort to salvage any possible good will with the Buyer," AHI would continue to try to sell the property to third parties "with the intention of returning the Buyer's deposit, if at all possible." Id. These attempts to sell the unit apparently failed. The Cantleys claim they invoked their right to cancel the deal under the Ten Percent provision, but AHI nevertheless kept the entire $196,500 deposit.

Further, on December 24, 2009 the Cantleys received notice

from the Ducharmes that AHI intended to terminate the Vitri Agreements and retain all deposits that were paid, unless the Cantleys made the required payments. The plaintiffs claim that, "[r]ealizing by this time that, on information and belief, AHI never owned any interest in the Vitri Units 31B or 37B. . . and that after the Ducharmes, on AHI's behalf, had defrauded K. Cantley out of her deposits made under the Venetian Agreement, [the plaintiffs] had no choice but to avoid making the payments that AHI demanded." Am. Compl. ¶ 67. AHI notified the plaintiffs that the Vitri contracts were deemed terminated and the deposits were forfeited. This lawsuit inevitably followed.

B.

In their complaint, the plaintiffs assert claims against AHI for fraud, breach-of-contract, and conspiracy to defraud (Counts II, III, and IV); and claims against the Ducharmes for fraud, conspiracy to defraud, civil theft, conversion, and unjust enrichment (Counts I, IV, V, VI, and VII). All the claims are based on the plaintiffs' contention that the Ducharmes, through AHI, fraudulently induced them to buy the condos by exaggerating the property values, falsely promising to make efforts to help them "flip" the units, and falsely guaranteeing that the Cantleys would not have to close on the units until AHI found a buyer or arranged

for the Cantleys to obtain financing.[4] Further, the Cantleys claim that AHI wrongly kept the entire $196,500 deposit on Kristen Cantley's Venetian unit, even though she invoked her right to cancel and forfeit only ten percent. The defendants now move to dismiss the case based on the forum selection clause in the contracts stipulating that litigation must take place in Panama, unless both sides consent to a different location.[5] The Cantleys argue that the forum-selection clause is invalid and unenforceable because litigating this suit in Panama would be inconvenient and fundamentally unfair.

## II. Legal Standard

### A.

The defendants have brought the motion to dismiss under

---

[4] Specifically, the plaintiffs allege that AHI fraudulently promised to "act as the [Cantleys'] agents to 'flip' the unit before the [Cantleys'] had to close on the units and [that] if AHI was not able to find a third-party buyer for the units before the units' scheduled closing date, AHI would provide financing." Am. Compl. ¶ 14. Instead, the plaintiffs claim that AHI made "no efforts to sell the units to third-party buyers before the scheduled closing date or arrange for alternative financing," thereby forcing the Cantleys to "forfeit the payments the purchasers made on the units before closing." Id. at ¶ 15. Finally, the plaintiffs allege the Ducharmes "kept AHI grossly undercapitalized so that any purchasers who sued AHI based upon the Ducharmes' fraud would be unable to collect on any judgment against AHI." Id. at 16.

[5] In the alternative, the defendants argue that the case should be dismissed based on the *forum non convenience* doctrine, lack of personal jurisdiction, and/or lack of an indispensable party. The Court does not reach these arguments.

Federal Rules of Civil Procedure 12(b)(3). A motion to dismiss based on a forum selection clause is properly brought pursuant to Rule 12(b)(3) as a motion to dismiss for improper venue. <u>Lipcon v. Underwriters at Lloyd's, London</u>, 148 F.3d 1285, 1290 (11th Cir. 1998). On such a Rule 12(b)(3) motion, the Court may consider matters outside the pleadings such as affidavit testimony, "particularly when the motion is predicated upon key issues of fact." <u>Webster v. Royal Caribbean Cruises, Ltd.</u>, 124 F. Supp. 2d 1317, 1320 (S.D. Fla. 2000) (citation omitted). The district court in <u>Webster</u> explained the inquiry on Rule 12 motions to dismiss as follows:

> [W]hen a party moves for dismissal for failure to state a claim under Rule 12(b)(6), the rule specifically provides that if the court considers matters outside the pleadings, the court is required to convert the motion to one for summary judgment under Rule 56 and serve notice upon the parties so that they may present all materials made pertinent to such a motion. For defenses raised under subsections (1) through (5), however, the court may consider matters outside the pleadings, and often must do so, since without aid of such outside materials the court would be unable to discern the actual basis, in fact, of a party's challenge to the bare allegation in the complaint that venue is proper in this court.

<u>Webster</u>, 124 F. Supp. 2d at 1320 (<u>citing</u> <u>Transmirra Prods. Corp. v. Fourco Glass Co.</u>, 246 F.2d 538-39 (2nd Cir. 1957)). On a motion to dismiss based on improper venue, the plaintiff has the burden of showing that venue in the forum is proper. The Court accepts the

factual allegations in the complaint as true, unless contradicted by the defendants' affidavits, and when an allegation is so challenged the Court may examine facts outside of the complaint to determine whether venue is proper. Wai v. Rainbow Holdings, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004) (citing cases). Applying these standards to the present case, the Court has considered the evidence submitted by the parties in connection with the defendants' motion to dismiss for improper venue that is relevant to the fact-intensive venue issues to be determined.[6]

### B.

Under the leading Supreme Court case, M/S Bremen v. Zapata Off-Shore Co., forum-selection clauses contained in international contracts are presumed to be valid and enforceable. Bremen, 407 U.S. 1, 10 (1972) (establishing federal standard relating to enforcement of forum clauses applicable in admiralty and international transactions). This presumption of validity may be overcome only by a clear showing that the clause is "unreasonable under the circumstances." Id. Courts have noted that the Bremen

---

[6] The plaintiffs filed a motion for leave to file a second supplemental declaration of Beckett Cantley [ECF No. 53]. The defendants opposed the filing and moved to strike it, arguing it was an improper sur-reply. The Court grants the plaintiffs' motion for leave [ECF No. 53] and denies the defendants' motion to strike [ECF No. 55]. Although the Court accepts Mr. Cantley's supplemental declaration and has reviewed it, in reality, many of the statements in all the opposing affidavits concerning alleged threats and misrepresentations are not specifically germane to the issues at hand.

approach is to "treat a forum selection clause basically like any other contractual provision and hence to enforce it unless it is subject to any of the sorts of infirmity, such as fraud and mistake, that justify a court's refusing to enforce a contract, or unless it does not mean what it seems to mean--unless, in other words, properly interpreted it is not a forum selection clause at all." Northwestern Nat. Ins. Co. v. Donovan, 916 F.2d 372, 375 (7th Cir. 1990). The test is whether "(1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of such provisions would contravene a strong public policy." Lipcon, 148 F.3d at 1290 (citing Bremen, 407 U.S. at 15-18).

### III. Analysis

Under Bremen and Lipcon, the presumption of enforceability applies only when the "the underlying transaction is fundamentally international in character." Lipcon, 148 F.3d at 1295. The plaintiffs do not dispute, and the Court holds, that the Venetian and Vitri agreements are fundamentally international in character. They were executed between United States citizens and a Belize corporation (i.e., AHI) concerning investment properties in Panama. See Id. at 1293 (finding that the subject of the agreement was

"truly international" when "the partes to the agreement [were] from different countries, the negotiations leading up to the agreement took place in the United States whereas the closing took place in England, and the subject matter of the transaction concerned investments in an international market."). Additionally, the parties do not dispute, and the Court holds, that the Panama forum selection clause is mandatory, rather than merely permissive. Paragraph 11 in each of the three purchase and sale contracts provides:

> **11. JURISDICTION**
> The present agreement is subject to the laws of Panama and disputes will be settled in Panama, unless both parties agree to settle the dispute in another court.

The defendants object to venue in this district and seek to defend the case in Panama; that is their right under the clause, and it is therefore considered mandatory.[7] The question, thus winnowed, is whether enforcing the mandatory forum selection clause would contravene any of the coercion, fairness, justice, and policy considerations discussed in Lipcon and Bremen.

Some of these considerations are not genuinely disputed. For example, although the plaintiffs make general assertions that the Ducharmes included the Panama clause in the condominium contracts

---

[7] The defendants have made submissions to the Court stipulating they agree to be served with process in Panama and to submit to personal jurisdiction of the courts in Panama. If the defendants change their position on this issue, the plaintiffs are entitled to notify me and I will revisit the issue.

11

in furtherance of their overall real estate scheme (*i.e.*, because the Ducharmes knew Panama law would limit the Cantleys' legal remedies for fraud), the plaintiffs do not and cannot contend that the Panama clauses were inserted into the contracts by any acts of fraud or overreaching. The Supreme Court has applied the fraud prong to mean that a "forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n. 14 (1974). However, "[t]his qualification does not mean that any time a dispute arising out of a transaction is based on an allegation of fraud. . . [that] the clause is unenforceable." Id. Instead, courts are cautioned to "ensure that more general claims of fraud will be litigated *in the chosen forum*, in accordance with the contractual expectations of the parties." Lipcon, 148 F.3d at 1296. The plaintiffs have not presented evidence or even argued that the Panama clause was put into the contract secretly or coercively. The contracts are short and straight-forward, only five or six pages in length. The choice-of-law and forum-selection clauses are both part of the same sentence, which is presented in a one-sentence paragraph under the heading: "**11. JURISDICTION**" (in bold, underlined, all-caps typeface, like the other headings). Additionally, the two Vitri contracts (but not the Venetian contract) are initialed by the buyer on every page. Further, Beckett Cantley is himself a lawyer and law professor who

teaches classes in area of tax, property, and business entities, and has published a number of law review articles including ones that touch upon the international aspects of business transactions. Mr. Cantley was involved in the transactions every step of the way. Finally, suffice it to say that the evidence also establishes beyond any question that Beckett Cantley was never coerced in the course of these real estate transactions. It is clear that the Panama clauses were obvious and known to all parties, and the plaintiffs don't even dispute this. The Court therefore finds that the first prong of the <u>Bremen</u> test does not invalidate the forum selection clause.

Next, the plaintiffs argue that, as a practical matter, they will be deprived of the opportunity to recover damages from either AHI or the Ducharme brothers if they are forced to prosecute the lawsuit in Panama.[8] It is unclear whether the plaintiffs' arguments about Panamanian law are aimed at the second or third <u>Bremen</u> factor (*i.e.*, whether "(2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; [or] (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy," <u>Bremen</u>, 407 U.S. at 15).

---

[8] Actually, their argument pertains to Panamanian law, which governs the dispute no matter where it is litigated, according to the contract. Nevertheless, if the Court's basis for striking the choice-of-*forum* clause was that Panama law is too unfair, that would be sufficient basis to disregard the choice-of-*law* clause, as well, if the case remained in Florida.

At any rate, the Cantleys' theory about not being able to recover damages under Panama law requires several assumptions. The first is that AHI is a "sham corporation" without assets to satisfy an adverse judgment. The plaintiffs' expert on Panama law, Elroy Alfaro, reviewed Panama's registries-of-title to determine whether AHI owned real property or motor vehicles in Panama. "On the basis of that search and of publicly available information," Mr. Alfaro concluded that, "AHI does not possess personal or real property located in the Republic of Panama that may be subject to seizure as of the date hereof." Alfaro Aff. Sec. I, ECF No. 46-1. Importantly, however, Mr. Alfaro falls short of actually saying that AHI could not satisfy a civil judgment. Nor could he offer such an opinion, because he apparently did not investigate whether AHI has assets in Panama other than real estate or cars, or assets in the United States that the Cantleys could reach by seeking to enforce the Panamanian judgment here. Of course, the corporation's financial situation would be less important if the Ducharmes could be held personally responsible for AHI's breach of contract. But the plaintiffs argue that "piercing the corporate veil" is not allowed in Panama:

> Panama law does not allow plaintiffs to file civil lawsuits against (1) a corporation's representatives, directors, shareholders, or officers as the corporation's alter egos; or (2) individuals who, within the course of soliciting and negotiating a contract on the corporations behalf, make false representations to induce a party to enter

14

> into the contract with the corporation. So although Panama law allows suits for fraud against parties to a contract--in this case, AHI--it prohibits a contracting party from piercing the contract to bring a tort action against individuals--the Ducharmes--for their misrepresentations made on the contracting party's behalf. As a result, by making misrepresentations on AHI's behalf, the Ducharmes shielded themselves from any individual liability.

Pl.'s Opp. to Def.'s Mot. to Dismiss, p. 8, ECF No. 46. As support for this argument, the plaintiffs rely on Mr. Alfaro's interpretation of Panamanian law. One of his legal opinions is that, "Panama law and its courts have been reluctant to pierce the corporate veil of corporations to allow claims against their shareholders, directors, officers, agents or representatives, except in very exceptional and specific circumstances." Alfaro Aff. ¶ 2. Mr. Alfaro cites to several legal authorities, including a quote from a Panama Supreme Court case about shareholder immunity (a case that apparently involved a corporate entity's criminal wrongdoing) for the position that:

> National Jurisprudence has permitted piercing of the Corporate Veil in cases in which corporations have been used with the sole intention of defrauding third parties or to flout the Law, facing thereby a case of abuse of the legal personality. The criteria used by this Court to pierce the corporate veil always has a common denominator, the fact that the parties do not respect the legal corporation, as well as disregard of the principle of separation of personalities, to reach thereby those hiding behind it.

<u>Id.</u> at ¶ 3. Thus, according to Mr. Alfaro, the Cantleys cannot reach the Ducharmes on the breach-of-contract claim because Stephen Ducharme signed the contract in his capacity as an employee of AHI. What about the Cantleys' claims against the Ducharmes for fraud and conversion--would the brothers be exposed to liability in tort? The proper statutory vehicle to assert tort claims against individuals is Article 1644 of Panama's Civil Code (Volume IV, Title XVI, "Of Obligations Acquired Without Agreement"). The plain language of Article 1644 suggests the Ducharmes could be susceptible to tort liability:

> Article 1644: Whoever by action or omission causes harm to another, with intervening guilt or negligence, is obligated to repair the harm caused. If the action or omission were imputable to two or more persons, each one of them shall be severally liable for the damages caused.

According to Mr. Alfaro, however, the Article 1644 analysis is more complicated than that. In his legal opinion, "Panama law does not permit a lawsuit [by the Cantleys] against the Ducharmes for making misrepresentations *on behalf of AHI* to induce the Cantleys to enter into agreements with AHI" (emphasis added). This is because:

> An action can not be brought on the basis of Article 1644 of the Civil Code, against an individual not a party to the Agreement, for representations made for the purpose of inducing a party to enter the Agreement, because it would be a tort action (for civil responsibility), that would not prosper in view of the existing agreement and the fact that the individual, not a party to the agreement, was acting on behalf of a

16

> contracting party when making the misrepresentations that induced another contracting party to enter into the agreement.

Not surprisingly, the defendants' expert on Panama law presents a different interpretation of the statute. Although Jose Andres Troyano Pena, a former judge of Panama's Supreme Court, stated his findings in a slightly more generalized and perfunctory manner, his ultimate conclusion seems fairly clear:

> We conclude then that a cause of action can be brought [under Article 1644] against individuals who, within the course of soliciting and negotiating a contract on a corporation's behalf, without being part of the contract, make false representation with the intent to induce a party to enter into a contract with the corporation, if harm is caused to the party induced to enter into said contract, due to the willful conduct or negligence of an individual inducing the harmed party to enter into said contract.

Pena Aff. ECF No. 41. Having considered the arguments and legal opinions submitted by both sides, the Court is satisfied that Panama law would not completely deprive the Cantleys of a chance to recover their alleged damages in this case. In reality, Panama courts have some discretion in deciding whether to pierce the corporate veil; and even Mr. Alfaro recognizes this. Likewise, there is flexibility built in to Article 1644 (at least judging by the fact one of the two experts believes the Ducharmes could be liable in tort). If the Cantleys' factual allegations are true--that is, if AHI has no assets, and the Ducharmes hid behind the corporate structure to perpetrate their fraud--I am confident the

brothers will not be permitted to hide in a black hole of Panama's law, where no liability can attach to their misconduct, simply because their scheme was well-hatched. Put differently, it is not plausible a Panama court would simultaneously respect the sanctity of AHI's corporate identity (even though the company was a set piece in the Ducharmes' scam), while at the same time accepting Mr. Alfaro's slightly academic position that the Ducharmes should be shielded from tort liability because the Cantleys' claims: "would not prosper [under Article 1644] in view of the existing agreement and the fact that the [Ducharmes], not a party to the agreement, [were] acting on behalf of [AHI] when making the misrepresentations," as Mr. Alfaro grimily predicted. If the plaintiffs' theory of the case is correct, it cannot be said in earnest that the Ducharmes were "acting on behalf of AHI" at all.

Thus, the Court does not accept the Cantleys' suggestion that they will be "deprived a day in court" if the Court enforces the forum selection clause, nor that Panama law is "fundamentally unfair." In reaching this conclusion, the Court is mindful of the Eleventh Circuit's comments in <u>Lipcon</u> that it "will not invalidate choice clauses. . . simply because the remedies available in the contractually chosen forum are less favorable than those available in courts of the United States. Instead, we will declare unenforceable choice clauses only when the remedies available in the chosen forum are so inadequate that enforcement would be

fundamentally unfair." Lipcon, 148 F.3d at 1297 (citations omitted). In support of that statement, the Eleventh Circuit cited the Second Circuit in Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1360-61 (2nd Cir. 1993), which stated that the agreement "must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum."

Finally, in the context of opposing the defendants' alternative basis for dismissal--that is, *forum non convenience*-- the plaintiffs argued that American public policy, Florida's interest in protecting residents against "predatory foreign business," the inconvenience of litigating in Panama, and so forth, all militate towards trying this case in Florida. Although the plaintiffs do not purport to direct these arguments at any particular prong of the Bremen analysis, the Court has considered them as arguments in favor of not enforcing the Panama clauses. These arguments do not alter the Court's judgment. There is no reason to doubt the validity and enforceability of the Panama forum-selection clause under any of the Bremen factors, or otherwise. Accordingly, the defendants' motion to dismiss for improper venue is granted.[9] It is hereby:

---

[9] Instead of outright dismissal, the plaintiffs ask the Court to retain jurisdiction and allow up to six months of discovery. The discovery would include taking depositions of the defendants and obtaining documents and communications "reflecting the Ducharmes' misrepresentations" relating to the condominium agreements, among

ORDERED AND ADJUDGED: The defendants' motion to dismiss under Rule 12(b)(3) is granted, because of improper venue based on a forum-selection clause in the contracts. This case is dismissed, without prejudice.

DONE AND ORDERED in Miami, Florida, February 14, 2011.

_____
WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE

---

other topics. According to the plaintiffs, the discovery will allow them to establish the Ducharmes' motive and intent to operate their scheme in a manner that would protect themselves from personal liability. It appears that the plaintiffs are attempting to make good on Mr. Cantley's earlier promise in a 2008 email that if he lost money on the Venetian deal he would "follow through with a long bleeding lawsuit that removes any profit from your seizure [of the deposits] over time." Def.'s Mot. to Dismiss, Ex. A1, ECF No. 38-1. Regardless, the discovery the plaintiffs seek would be for the purpose of establishing the general allegations of fraud that are the subject of the underlying lawsuit, which must be litigated in Panama.